UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMANDO E. HERRERA,<br><br>    Petitioner,<br><br>    v.<br><br>GISELLE MATTESON,<br><br>    Respondent. | Case No.   1:19-cv-01150-JLT-HBK (HC)<br><br>FINDINGS AND RECOMMENDATIONS TO DENY AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND TO DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY [1]<br><br>FOURTEEN-DAY OBJECTION PERIOD<br><br>(Doc. No. 20) |

     Petitioner Armando E. Herrera ("Herrera" or "Petitioner"), a state prisoner proceeding pro se, has pending an amended Petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. No. 20, "amended Petition"). The amended Petition raises one ground for relief: the evidence was insufficient to support his conviction. (*Id*. at 7-9). For the reasons set forth below, the undersigned recommends the district court deny Petitioner any relief on his amended Petition and decline to issue a certificate of appealability.

////

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).

1

# BACKGROUND

## A. Procedural History

Herrera initiated this case on August 20, 2019 by filing a pro se petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. No. 1). On May 12, 2020, Respondent moved to dismiss the petition on the basis that most of the grounds were unexhausted. (Doc. No. 11). On June 4, 2020, Herrera moved for a stay and abeyance of his petition for the purpose of exhausting his unexhausted claims before the state courts. (Doc. No. 16). Respondent opposed the motion to stay. (Doc. No. 17). On July 14, 2020, the then-assigned magistrate judge issued an order to show cause to Petitioner why his motion to stay should not be denied. (Doc. No. 18). On September 14, 2020, Herrera notified the Court that he wished to dismiss his unexhausted claims and proceed only with his exhausted claims. (Doc. No. 19). Herrera accompanied his notice with his amended Petition. (Doc. No. 20). On November 17, 2020, the case was reassigned to the undersigned. (Doc. No. 21).

The amended Petition identified three grounds for relief. (Doc. No. 20). On May 10, 2021, Respondent filed a motion to dismiss grounds two and three in the amended Petition as untimely. (Doc. No. 24). Petitioner opposed the motion only as to ground three, but conceded ground two was untimely. (Doc. No. 27). On November 16, 2021, the undersigned issued findings and recommendations to grant Respondent's motion to dismiss grounds two and three as untimely, and the findings and recommendations were adopted in full on March 14, 2022. (Doc. Nos. 29, 37). Respondent then filed an answer to the remaining ground in the amended Petition, and lodged the pertinent state court record. (Doc. Nos. 39, 40). On June 6, 2022, Herrera filed a traverse. (Doc. No. 41). The matter is deemed submitted on the record before the Court.

## B. Facts Based Upon the State Court Record

In 2014, a Kern County jury convicted Herrera of second degree murder; personally discharging a firearm at an occupied motor vehicle; and carrying a loaded firearm in public while actively participating in a criminal street gang. (Doc. No. 20 at 1; Doc. No. 39-1 at 572-73). The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Court of Appeal. Unless a petitioner demonstrates by clear and convincing evidence otherwise, a

presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

### *Prosecution's Case*

On June 5, 2005, at about 5:00 p.m., Detective Pete Mendoza responded to a report of gunfire at the Sno Fun shave ice drive-in in Delano. When he arrived at the scene, he found Ebelio Avila slumped over in the driver's seat of his pickup truck, deceased. Avila had suffered gunshot wounds to his face and head.

### *Eyewitnesses*

### **Thelma Ontiveros**

Thelma Ontiveros was parked next to the driveway entrance of the Sno Fun. From her side-view mirror, she saw a man approach the passenger's side door of Avila's pickup holding a black semiautomatic handgun. While Ontiveros could not hear the conversation, she noted the men appeared to be arguing for approximately 10 minutes. When the vehicle in front of her left, she drove into an alleyway nearby, called 911, and continued to observe the confrontation. Ontiveros saw the suspect lean against the pickup, extend his right arm inside, and shoot two or three times. The suspect stopped, began slowly walking away, returned, and began shooting again. Ontiveros gave a general description of the suspect from which a police composite sketch was drawn. She described the suspect as a 17- to 20-year-old Hispanic male, light complected with a near-shaven head, wide nose, full lips, five feet eight inches in height, and "a little heavy"—at least 190 pounds. Ontiveros was unable to identify the shooter in a 2010 photo lineup.

### **Enrique Mendoza**

Enrique Mendoza was 13 years old at the time of the shooting. He was in a car with his mother Maria Mendoza, driving by the Sno Fun drive-in when he heard multiple popping sounds, like fireworks. He saw a man shooting a gun into a white pickup. He then heard a second series of gunshots. Enrique told police the shooter was about five feet three inches tall with a "round head."

### **Maria Mendoza**

Maria Mendoza heard multiple gunshots in two intervals. She saw the suspect from the back as he walked away. Maria described him as short and stocky with "dark hair and [a] round head." In a 2010 photo lineup, Maria identified two people with round heads. One of them was defendant.

### **Adalberto Chavez**

Adalberto Chavez was 15 years old at the time of the shooting. He was with his cousin Jose Martinez when he heard gunshots in two intervals. He saw a man shooting into Avila's pickup. The shooter

3

was standing next to the passenger's side door with his right hand extended inside the pickup. The shooter may have pushed off the passenger's door with his left hand because Chavez saw the suspect's left arm extending out before fleeing. He described the suspect as "short," around five feet six inches, and heavy-set or "bigger-bodied." In a 2010 photo lineup, Chavez identified defendant as the shooter based on defendant's body weight.

**Jose Martinez**

Jose Martinez was 10 years old at the time of the shooting. He told police the shooter was a Hispanic adult male with a shaved head. In a 2010 photo lineup, Martinez identified defendant as the shooter. At trial, he was unable to remember significant details about the shooting.

*The Investigation*

At the crime scene, Detective Gerald Lewis noticed Avila's pickup truck appeared to have been recently washed. Jessica Flores, Avila's fiancée, testified Avila cleaned his pickup almost daily. According to Flores, on the morning Avila was shot, he washed and detailed his truck with ArmorAll.

Criminalist Nicole Townsend processed the pickup for latent prints. A palm print was lifted from the passenger's side rear door panel beneath the window. In 2005, the Automated Fingerprint Identification System (AFIS) was not capable of running palm prints for possible matches. In 2010, however, Townsend was able to run the latent palm print in the AFIS database. Among other possible candidates, the print matched defendant's palm print.

Townsend then independently compared the latent print with defendant's left palm print from his local arrest record and from his prints taken in court at trial. She opined the latent palm print on Avila's pickup truck belonged to defendant. Criminalist Jacqueline Moore also independently compared the latent palm print found on Avila's truck with defendant's prints. She concluded the left palm print lifted at the crime scene belonged to defendant.

*Gang Evidence*

Detective Michael Strand testified as a gang expert for the prosecution at trial. He had been a police officer with the City of Delano for four years and a detective for six months. During his career as a police officer, he focused primarily on gang suppression, intelligence gathering, and investigating violent feuds between the Norteño and Sureño criminal street gangs. He developed over 3,000 gang contacts during his career.

Strand opined defendant committed the instant offenses for the benefit of the Delano area Norteños, also known as Delano Norte. The evidence adduced at trial showed defendant claimed membership to West Side Delano Norte, a subset of Delano Norte, and the overarching Delano Norte gang. The evidence also showed

4

Avila claimed membership to the Sureños, a rival criminal street gang.

Strand explained the territorial dividing line between the Norteños and Sureños is the area between Delano and McFarland. Delano is predominately Norteño gang territory while McFarland is 100 percent Sureño territory. The Sno Fun is in Norteño territory.

Officer Donald Flores testified he was at the scene of the shooting in the instant case on June 5 and the next day on June 6, 2005. He noted that sometime between June 5th and 6th, a building wall in the alley near the Sno Fun had been spray painted with blue graffiti. He described the graffiti as southern (Sureño) in nature. The message stated, "187 on all Busters," a derogatory term for Norteños. It covered the ground level of the wall all the way up to the top, about 15 feet high. Officer Flores opined the graffiti directed retribution against Norteño gang members for the homicide of Avila.

Strand surmised the graffiti was a message to other gang members. He opined the graffiti was a sign the Sureños were angry about Avila's murder, and the message served as a warning to Norteños that the gang would take retribution against them.

### *The Delano Norte Criminal Street Gang*

According to Strand, Delano Norte comprises multiple subsets or cliques, including West Side Delano, East Side Delano, North Side Delano, Varrio Delano Locos, 21st Street, Youth Gone Wild, Way of Life, and Young Bucks. Any member of a subset could call himself a member of Delano Norte, but not of the "Northern Structure." The subsets get along with one another.

Strand testified the primary activities of Delano Norte include murder, attempted murder, vehicle theft, robbery, assault with a deadly weapon, narcotics sales, drive-by shootings, arson, witness intimidation, grand theft, burglary, rape, kidnapping, carjacking, vandalism, firearm-related offenses, and criminal threats. To show Delano Norte has committed a pattern of criminal gang activity, Strand adduced evidence of three predicate offenses.

### *Defendant's Active Gang Status Detective*

Strand opined defendant was a Delano Norte criminal street gang member based on prior admissions, gang-related tattoos, the fact he has been previously documented wearing the color red, and his association with other documented Norteños. His opinion was based on police reports and the testimony of various witnesses.

Officer Vincent Lopez testified he was with another officer who had detained defendant on June 13, 2004, for driving without a license. When asked if he was a member of a gang, defendant replied affirmatively and claimed membership to the West Side Norteños. Officer Lopez observed a four-dot tattoo on defendant's left lower elbow. Strand explained a four-dot tattoo on a Norteño's

5

elbow or hand is a sign of earned membership by "putting in work" on behalf of the gang, such as by committing shootings or stabbings. During this incident, defendant was also documented in the company of Everardo Contreras, Jr., and Ruben Garza, who are both Norteños.

Officer Monty Lewis testified he had detained defendant on December 2, 2007, at a police checkpoint. Defendant was a passenger in a car with four individuals. He yelled, "'Delano Norte,'" "'Fuck the police,'" and "'Fuck the Bulldogs,'" a known Fresno gang. Defendant was arrested for resisting arrest, public intoxication, and giving false information. Throughout the arrest, he continued yelling, "'Delano Norte.'" At the police station, defendant shouted, "'Fuck those mutts. Delano Norte. Motherfucker. Fuck the Bulldogs.'" Strand explained the Bulldogs and the Norteños are rivals.

Defendant's girlfriend, Mona Melendez, had known him for over 10 years. During police questioning, Melendez told Detective Campos defendant was a Norteño gang member. She also stated defendant "'[a]lways had two friends with him,'" whom she identified as Victor Garcia and Everardo Hernandez. According to Melendez, when they called, defendant "would just leave us. They were the most important thing" to him. Strand opined Victor Garcia was a northern gang member.

### *Opinion the Crime was Committed for the Benefit of a Criminal Street Gang*

Based on a hypothetical mirroring the facts of the instant case, Strand opined the instant crime was committed for the benefit of the Norteño gang in Delano (Delano Norte). In Delano, the rivalry between the Norteños and the Sureños often manifests in violent crimes. By eliminating a rival gang member, a Norteño elevates his status as well as the status of the gang. A shooting similar to the instant case would benefit the Norteños by lowering the status of the Sureños and by instilling fear into the community.

### *Avila's Active Gang Status*

Detective Strand opined Avila was an active Sureño gang member based upon statements by Avila's family and friends, his past confrontations with Norteños, booking admissions and police reports, his display of the color blue and his association with other documented Sureños, and because graffiti was spray painted in an alley calling for the murder of "all Busters" after Avila's murder.

Jessica Flores, Avila's fiancée, testified Avila was known to associate with criminal street gangs and he was regularly harassed by Norteños. She described several prior incidents wherein she and Avila were encircled at a fast food restaurant and followed at a shopping mall. The night before he was killed, Avila's tire was slashed at a Blockbuster parking lot. Avila carried a gun for protection against Norteños. He told Flores the Norteños were

6

> trying to intimidate him into leaving town but he "didn't want to leave."
>
> Jose Camacho and Avila were friends who had met in high school, sometime between 1997 and 2001. Camacho associated with Sureños. While Camacho did not know if Avila was a Sureño, he stated Avila had many troubles with Norteños. In 1999, Camacho and Avila were walking home after school when a vehicle approached them. Someone yelled, "Delano Norte" and fired at them. Norteños confronted Avila in high school for "wearing a lot of blue," and asked him if he was a Sureño. In 2000, Avila shot at Norteño gang member Victor Garcia in retaliation for a shooting perpetrated by Garcia against Avila. In 2010, Camacho circled defendant's picture in a yearbook as an example of another person with whom Avila had troubles in high school. Avila had arguments with defendant, and defendant warned Avila to "watch his back."
>
> ### *Defense's Case*
>
> Defendant's girlfriend, Mona Melendez, testified she and defendant attended a baby shower for their first child on the day of the shooting. As proof, she presented the rental application for the patio where the shower was held. She claimed defendant was with her the entire time, from the early afternoon until the evening. Melendez did not remember if her mother was at her shower. She found no pictures taken from the baby shower.
>
> Jennifer Rios, Melendez's cousin, testified she arrived at the baby shower before 4:00 p.m. and stayed until 8:00 p.m. Rios claimed she never saw defendant leave the shower. She also testified she never saw any photos from the baby shower. She admitted previously telling police she saw Melendez taking photos, "'We're a big family and we are always taking pictures of everything to remember everything by.'"
>
> ### *Rebuttal*
>
> Lorraine Melendez testified she had attended the June 2005 baby shower for her daughter. Lorraine had observed people taking pictures. The distance between the location of the baby shower and the Sno Fun shave ice drive-in is seven miles with a driving time of about eight minutes.

(Doc. No. 39 at 2105-2112); *People v. Herrera*, No. F069894, 2017 WL 4564227, at *2-5.

## II. APPLICABLE LAW

### A. AEDPA General Principles

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to

7

first "exhaus[t] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then the AEDPA mandates a deferential, rather than *de novo*, review. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016). This deferential standard, set forth in § 2254(d), permits relief on a claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is both mandatory and intentionally difficult to satisfy. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision. *White*, 572 U.S. at 419. Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law. 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's

8

decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

As discussed earlier, for the deferential § 2254(d) standard to apply there must have been an "adjudication on the merits" in state court. An adjudication on the merits does not require that there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S. at 98. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

9

1  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state

2  court decision "for a specific and narrow purpose—to identify the grounds for the higher court's

3  decision, as AEDPA directs us to do." *Id*. at 1196.

> When . . . there is no reasoned state-court decision on the merits, the federal court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102.  If such disagreement is possible, then the petitioner's claim must be denied. *Ibid*.

*Sexton*, 138 S. Ct. at 2558..

## III.  ANALYSIS

For purposes of reviewing Petitioner's claim, the Court considers the last reasoned decision on Petitioner's claims—that of the California Court of Appeal.  Because the Court of Appeal rejected petitioner's claims on the merits, the deferential standard of § 2254 applies.

**A.  Background**

Petitioner argues there is insufficient evidence that he was the shooter because he had an alibi, the identification evidence was "weak, incorrect, and most often non-existent," the palm print evidence "could have been innocently the result of Petitioner touching the vehicle at a different time," and there is no evidence that Petitioner had direct connection with any gang activity.  (Doc. No. 20 at 7-8).  As to the palm print evidence, Petitioner contends that he was arrested over five years after the crime occurred based on a later identified palm print on the outside of the victim's truck, but, as argued at trial, Petitioner was working at the time cleaning the parking lot at Jack in the Box and may have touched the vehicle prior to the time of the shooting.  (*Id*.; Doc. No. 41 at 4).  Thus, Petitioner argues that "[g]iven that the other prints on the outside of the truck were never identified, this single print which was the result of innocent work related activity by the petitioner, demonstrates that it is clear that [the] palm print evidence cannot be considered 'substantially incriminating.'"  (Doc. No. 20 at 9 (citing *Mikes v. Borg*, 947 F.2d 353, 356-57 (9th Cir. 1991) (in "fingerprint-only cases" the "prosecution must present evidence

10

1 sufficient to permit the jury to conclude that the objects on which the fingerprints appear were
2 inaccessible to the defendant prior to the time of commission of the crime.").

3 As to alibi, Petitioner contends that he presented "documentary and witness testimony" at
4 the trial that he was at a baby shower for his first child at the time the shooting occurred. (*Id*.).

5 As to eyewitness identification, Petitioner argues that there "was no eyewitness
6 identification who saw the shooter." (*Id*. at 9). According to Petitioner, one witness "saw the
7 shooter's face for 10 minutes" and described him as 17 to 20 years old, five foot five inches tall,
8 between 160 and 170 pounds, and medium build with "somewhat of a belly"; but she did not
9 identify the petitioner from the photo lineups nor did she identify the petitioner in person, and she
10 reported that the shooter was not depicted in the photo lineup. (*Id*. at 7-8). Petitioner argued that
11 witness Maria Mendoza did not see the shooter's face and told the officer she was not sure who
12 the shooter was, but circled two individuals that most closely resembled the shape of the shooter's
13 head. Petitioner also contends that none of the witnesses saw a photo lineup of men "originally
14 suspected as enemies." (*Id*. at 8). In his reply, Petitioner further claimed that eyewitnesses
15 identified the shooter as 5'3", 5'6", 5'8", but petitioner's mug shot identified him as 5'10". (Doc.
16 No. 41 at 5).

17 Finally, as to the gang evidence, Petitioner claims that no evidence was presented that he
18 had "committed any violent gang behavior or had any direct connection with gang members
19 suspected of violent behavior against the victim." (Doc. No. 20 at 8). Based on the foregoing,
20 Petitioner asserts that "no rational trier of facts could have found proof of petitioners [sic] guilt
21 beyond a reasonable doubt in terms of elements defined by state law." (Doc. No. 41 at 4 (citing
22 *Jackson v. Louisiana*, 406 U.S. 362)).

23 In its Answer, Respondent cites in full the California Court of Appeal opinion addressing
24 the sufficiency of the evidence. (Doc. No. 40 at 8-11 (citing Doc. No. 39-1 at 2112-17)).
25 Respondent argues Petitioner is attempting to reweigh the trial evidence in his favor, and his
26 attempts to attack the credibility of witnesses are futile because credibility determinations are for
27 the jury to decide. (Doc. No. 40 at 12-13).

28

In support, Respondent refers the Court to the state appeals court opinion denying Petitioner relief on this ground:

> **B. State Appellate Court Decision**
>
> Defendant challenges the sufficiency of the evidence showing he was the perpetrator of the shooting.[FN1]  He contends (1) his conviction was based on the presence of a palm print on the victim's truck matching his palm print, which could have been left days prior to the shooting; (2) the "true" eyewitness to the shooting failed to identify him as the shooter; and (3) the gang evidence failed to show he was the shooter.  The Attorney General replies substantial evidence supports the conclusion defendant was the shooter.  We agree with the Attorney General.
>
>> [FN1] Because defendant challenges the sufficiency of the evidence supporting count 3 in part III, post, we interpret his argument to challenge all other counts.
>
> **Standard of Review**
>
> The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Delgado* (2008) 43 Cal.4th 1059, 1067.)  In reviewing a record for substantial evidence, we do not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these functions are strictly reserved for the trier of fact.  (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367.)  Our inquiry is limited to determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Marshall* (1997) 15 Cal.4th 1, 34.)
>
> We reject evidence accepted by the trier of fact only when it is inherently improbable and impossible of belief. (*People v. Maxwell* (1979) 94 Cal.App.3d 562, 577.)  Before setting aside the judgment of the trial court for insufficiency of the evidence, it must clearly appear there is no hypothesis whatsoever upon which there is substantial evidence to support the verdict. (*People v. Conners* (2008) 168 Cal.App.4th 443, 453; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)
>
> **Legal Analysis**
>
> Defendant challenges the sufficiency of the evidence supporting his convictions.  He specifically contends there was insufficient evidence to show he was the shooter.  He complains he was convicted based solely on palm print evidence, the eyewitnesses failed to identify him as the shooter, and the gang evidence did not show he was the shooter.  We find defendant's contentions unpersuasive.

1. The Palm Print Evidence

Defendant essentially contends his case is based solely on palm print evidence. He analogizes the instant case to a line of so-called "fingerprint-only cases."

His reliance on these cases is misplaced. (*People v. Redmond* (1969) 71 Cal.2d 745, 756 [fingerprint evidence could not be considered substantially incriminating in burglary and assault case where victim was unable to identify defendant as her assailant and defendant was lawfully in victim's home the night before crime had occurred]; *People v. Flores* (1943) 58 Cal.App.2d 764, 769-770 [evidence of defendant's fingerprint inside stolen vehicle proved he was inside the vehicle but did not prove beyond a reasonable doubt he had stolen it]; *Birt v. Superior Court* (1973) 34 Cal.App.3d 934, 937-938 [evidence female defendant's fingerprint was found inside a rental vehicle used in a burglary was insufficient to sustain burglary charge against her where victim testified the perpetrators were two men]; *People v. Johnson* (1984) 158 Cal.App.3d 850, 854 [single thumbprint on one of multiple bottles containing illicit substance found in a home where nine people were living was insufficient to show defendant was in possession of the bottles].)

Here, the presence of defendant's palm print near the passenger's side door of Avila's truck is substantially incriminating. Ontiveros, Chavez, and Martinez reported seeing the shooter leaning on the truck next to the passenger's side door. The latent palm print was found in this area: on the passenger's side door of the truck, underneath the rear window door.

Ontiveros had previously told detectives she did not see the shooter lean against or touch Avila's truck, however, she later testified she had seen the shooter lean his left arm against the pickup. Chavez testified the shooter appeared to have pushed off from the truck. When he was interviewed just after the shooting, Martinez told Detective Lewis he saw the shooter lean up against the pickup with his left hand as he fired the gun a second time. In a 2010 interview, Martinez indicated he saw the shooter lean against the passenger side of the pickup. Based on the testimony of these witnesses, the jury could have reasonably inferred defendant touched the truck during the shooting.

Defendant asserts there are alternative exculpatory explanations for the presence of his palm print on Avila's truck. He suggests there is some evidence Avila may not have washed the passenger's side of his truck on the morning of the shooting, and it is possible he touched Avila's truck on a prior occasion. We reject defendant's attempts to reargue the evidence on appeal.

Avila's fiancée testified Avila cleaned his truck almost daily. On the morning he was shot, she observed Avila wash and shine his truck. When Detective Lewis responded to the crime scene, he noted Avila's truck appeared to have been recently washed. Thus, there was circumstantial evidence to support the conclusion the area

13

where defendant's palm print was found had been washed the morning of the shooting.

Insofar as defendant suggests he may have touched Avila's truck when Avila visited the Jack-In-The-Box fast food restaurant where defendant worked, there is no evidence to support his assertion. Indeed, Flores testified she and Avila had not visited Jack-In-The-Box the day of or the day before Avila was killed.

Even assuming the record provided some support for defendant's claim, the jury apparently discredited any exculpatory explanations for the presence of defendant's palm print on Avila's truck in finding defendant guilty. Not only are we prohibited from reweighing the evidence presented below (*People v. Culver*, *supra*, 10 Cal.3d at p. 548), we are required to resolve all conflicting evidence in favor of the judgment (*People v. Campbell* (1994) 25 Cal.App.4th 402, 408). We find defendant's alternative explanations wholly unpersuasive.

2. Eyewitness Identifications

Defendant claims the "true" witness to the shooting failed to identify him as the shooter. He argues Ontiveros, the witness with the best view of the shooter, did not identify him as the shooter in a photo lineup. He further contends the other witnesses' identifications were tentative, possibly coerced, or based on guesses.

Defendant specifically claims Ontiveros was unable to identify defendant in a 2010 photo lineup as the shooter even though a composite sketch was drawn based on her description of the shooter; Adalberto Chavez identified defendant based on the fact defendant was the heaviest subject in the photographic lineup; Enrique Mendoza was not wearing glasses when he observed the shooting, although he needed them; Maria Mendoza selected defendant as one of two possible suspects based on the shape of defendant's head; and Martinez identified defendant as the shooter randomly because he felt pressured by detectives to pick someone.[FN2] He further contends the witnesses' identifications lack credibility given their descriptions of the shooter's height compared to defendant's actual height.

> [FN2] Defendant does not argue the lineup procedures were unduly suggestive.

Although Ontiveros's inability to identify the shooter in a photographic lineup may be attributed to the fact the lineup was conducted five years after the shooting had occurred, we need not speculate as to why she was unable to make an identification. The witnesses were thoroughly and vigorously cross-examined at defendant's trial. In closing argument, defendant's trial counsel emphasized the flaws in the witnesses' identifications, including the inconsistencies between their prior statements to police and their testimony at trial. The jury was instructed to consider various factors in determining the credibility of the witnesses and the

14

weight their identifications should be given, including how well the witness could see the perpetrator, how much time had passed between the event and the identification, whether the witness had ever failed to identify defendant, and how certain the witness was when he or she made the identification. Nothing in the record shows the jury failed to consider these factors in reaching its verdict.

The jury heard and considered the evidence defendant claims undermines the witnesses' identifications but nonetheless found them credible. The credibility of the witnesses and the weight of their identifications was ultimately a matter for the jury to decide. (*People v. Ennis* (2010) 190 Cal.App.4th 721, 729.) We find no basis to reject the witnesses' testimony on appeal.

3. Gang Evidence

Finally, defendant contends the gang evidence failed to show defendant shot Avila. Defendant asserts "there was nothing specific about the shooting to designate it as a gang-related hit." He further contends there was no evidence Avila was targeted by the Norteños or by defendant.

We initially observe the gang evidence was admitted to show motive, rather than identity. Further, although defendant suggests the gang evidence failed to show the shooting was gang-related, the record refutes his assertion.

Defendant and Avila were shown to be members of rival criminal street gangs. Defendant claimed membership to West Side Delano, a subset of Delano Norte, and the overarching Delano Norte criminal street gang. Avila claimed membership to the Sureños. Avila had been confronted by the Delano-area Norteños on multiple prior occasions. The most recent incident occurred the night before he was killed.

In addition to Avila's prior confrontations with Norteño gang members, the circumstances of the shooting suggest the crime was gang related. Avila was shot multiple times, at close range, in Norteño gang territory as he sat in his truck. According to Ontiveros, an armed male approached Avila and a verbal argument ensued. The man lowered and raised and lowered his gun until he eventually fired a series of gunshots at Avila. As the shooter began to walk away, he returned, fired several more shots, and then fled. Following the shooting, a 15-foot high writing, "187 on all Busters," was spray painted in blue paint on a wall near the Sno Fun. In our view, this evidence amply supports the conclusion the shooting was gang related, and possibly even a gang hit because of the manner in which Avila was killed. We conclude the record contains substantial evidence to support defendant's convictions. The presence of the palm print matching defendant's palm print on Avila's truck and the witnesses' identifications and descriptions of the shooter amply support the conclusion defendant was the perpetrator of the shooting.

15

(Doc. No. 39-1 at 2112-17); *Herrera*, No. F069894, 2017 WL 4564227 at *5-8.

## C. Petitioner is not Entitled to Relief

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The federal standard for determining the sufficiency of the evidence to support a jury finding is set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (a reviewing court "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury")' *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) ("we acknowledge our obligation under Jackson to identify those rare occasions in which 'a properly instructed jury may … convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt").

Further, when both *Jackson* and AEDPA apply to the same claim, the claim is reviewed under a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012). As noted by the Supreme Court:

> First, on direct appeal, "it is the responsibility of the jury−not the court−to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.' "

*Coleman*, 566 U.S. at 651. Here, viewed in the light most favorable to the prosecution, a rational jury could have found beyond a reasonable doubt that Herrera was the shooter. The contrary

evidence cited by Herrera in the Petition was presented to the jury, who assessed all of the evidence, and rejected.

First, as to the "latent" palm print that was pulled from the passenger side of the victim's truck, the jury heard Herrera's argument that the victim might not have washed his truck the day of the shooting, and that Herrera may have touched the truck on a prior occasion while he was working at Jack in the Box. (Doc. No. 39-1 at 2114). However, the jury also heard evidence from multiple eye-witnesses that Herrera leaned against the truck with his left hand in the same area as the palm print was found at the time of the shooting; testimony from the victim's fiancée that he cleaned his truck "daily" including earlier on the same day of the shooting; and further testimony from the victim's fiancée that they had not visited Jack in the Box on the day of the shooting or the previous day. (*Id*. at 2113-14). As observed by the Court of Appeal, the jury could have reasonably inferred from this evidence that Herrera touched the truck during the shooting and "[e]ven assuming the record provided some support for defendant's claim, the jury apparently discredited any exculpatory explanations for the presence of defendant's palm print on Avila's truck in finding defendant guilty. Not only are we prohibited from reweighing the evidence presented below, we are required to resolve all conflicting evidence in favor of the judgment." (*Id*. at 2114-15)(internal state law citations omitted)); *Cavazos*, 565 U.S. at 7 n.* (reweighing of the facts is precluded by *Jackson*); *Nevils*, 598 F.3d at 1170 (in assessing sufficiency of the evidence claim, it is not the court's function to reweigh the evidence).

Second, the jury heard and considered the evidence Herrera point to as undermining the eyewitness identifications, and nonetheless found the eyewitness identifications credible. As described above, Herrera cites evidence that one eyewitness was unable to pick him out of a photo line-up, one eyewitness selected two possible shooters based on the shape of their heads, and several eyewitnesses inaccurately described his height and weight. (Doc. No. 39-1 at 2115). However, as noted by the Court of Appeal, the eyewitnesses were "thoroughly and vigorously" cross-examined at trial, trial counsel highlighted flaws and inconsistencies in the identifications during closing arguments, and the court instructed the jury to consider factors in determining the credibility of witnesses. (*Id*. at 2115-16). This court is precluded from re-weighing the evidence

17

or re-assessing witness credibility. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995 ("[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."); *Bruce v. Terhune*, 376 F.3d 950, 957–58 (9th Cir. 2004) ("[a] jury's credibility determinations are … entitled to near-total deference under *Jackson*"); *Avenida v. Walker*, 2009 WL 840659, at *14 (E.D. Cal. Mar. 26, 2009) (holding that evidence was legally sufficient to support murder conviction when although "there were inconsistencies in witness testimony and other evidence suggesting [petitioner] was not the shooter," jury was entitled to disbelieve that evidence in favor of evidence that supported conviction, including eyewitness identifications of petitioner and his car). While it might have been possible to draw a different inference from this evidence, this court is required to resolve any conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326.

Third, as to the gang evidence, Herrera generally claims no evidence was presented that he had "committed any violent gang behavior or had any direct connection with gang members suspected of violent behavior against the victim." (Doc. No. 20 at 8). This assertion is belied by the trial record, which includes evidence that both Herrera and the victim were members of rival street gangs, the victim had been confronted by rival gang members on multiple occasions including on the night before he was killed, the victim was killed in rival gang territory, and following the shooting a 15-foot high writing "187 on all Busters" was spray painted in blue paint on the wall near the location where the victim was shot. (Doc. No. 39-1 at 2116-17). Moreover, as observed by the Court of Appeal, this evidence was admitted to show motive, rather than identity. (*Id*. at 2116). Based on the foregoing, it was reasonable for the Court of Appeal to find the evidence "amply supports the conclusion the shooting was gang related." (*Id*. at 2117).

Finally, Herrera argues the evidence is insufficient to support his conviction because he presented "eyewitness evidence that supported his alibi." (Doc. No. 20 at 7). Although not addressed by the Court of Appeal, the jury heard testimony from Herrera's girlfriend, and his girlfriend's cousin, that at the time of the shooting Herrera attended the baby shower for his first child. (Doc. No. 39-1 at 1525-32, 1541-47). However, the jury also heard testimony on cross examination that Herrera's girlfriend could not remember certain details from the party, nor did she have any photographs of the event; and testimony from Herrera's girlfriend's cousin that she

had previously reported to investigators that photographs were taken at the party. (*Id*. at 1529-32). As noted above, under clearly established federal law governing sufficiency of the evidence claims, a jury's credibility findings are "entitled to near total deference under *Jackson*." *Bruce*, 376 F.3d at 957–58; *Schlup*, 513 U.S. at 330.  The jury was entitled to disbelieve the alibi testimony in favor of contrary evidence that supported conviction.  And when viewed in the light most favorable to the prosecution, the Court cannot find no rational trier of fact could not have agreed with the jury.

In summary, viewing the evidence in the light most favorable to the prosecution, it was objectively reasonable for the Court of Appeal to determine that there was substantial evidence that Petitioner was the perpetrator of the shooting.  As such, the Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor an unreasonable determination of the facts.  The undersigned recommends the amended Petition should be denied.

## IV.  CERTIFICATE OF APPEALABIILTY

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Here, petitioner has not made a substantial showing of the denial of a constitutional right.  Thus, the undersigned recommends that the court decline to issue a certificate of appealability.

////

Accordingly, it is **RECOMMENDED**:

1. The amended Petition be denied. (Doc. No. 20).
2. Petitioner be denied a certificate of appealability.

**NOTICE TO PARTIES**

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen (14) days after being served with these findings and recommendations, a party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Dated:   September 26, 2022

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE